379 A.2d 564

**COMMONWEALTH of Pennsylvania**

v.

**Mary SEABROOK, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 13, 1977.

Decided Oct. 28, 1977.

Lawrence S. Rosenwald, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Gaele M. Barthold, Philadelphia, for appellee.

Before EAGEN, O'BRIEN, POMEROY, NIX and MAN-DERINO, JJ.

## OPINION OF THE COURT

POMEROY, Justice.

■■■■ In this appeal from a conviction for voluntary manslaughter[1] the principal issue[2] is whether the appellant was deprived of a fair trial on the merits because of the conduct of the judge presiding at the suppression hearing. We find appellant's argument to be without merit, and affirm.

### I.

At the suppression hearing, Detective Herbert Winston testified that he read the warnings required by *Miranda v.*

---

1. 18 Pa.C.S.A. § 2503 (1973). This Court has jurisdiction of this appeal pursuant to the Appellate Court Jurisdiction Act, Act of July 31, 1970, P.L. 673, art. II, § 202(1), 17 P.S. § 211.202(1) (Supp.1977–78).

2. Appellant also argues that the verdict, entered after a bench trial, was contrary to the weight of the evidence. We have reviewed the record and are satisfied that this contention is groundless. See, e. g., *Commonwealth v. Walley*, 466 Pa. 363, 353 A.2d 396 (1976).

*Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) to appellant from a standard *"Miranda* card" and entered her answers on a standard interview sheet. The questions are not reprinted on the interview sheet; instead, seven spaces are provided on the sheet for the recording of the suspect's answers. After appellant had answered the first six questions in such a way as to indicate that she wished to waive her *Miranda* rights, Detective Winston asked her the seventh and last question: "Are you willing to answer questions of your own free will, without force or fear, and without any threats or promises having been made to you?" To this, Detective Winston testified, appellant answered "yes," but he mistakenly entered "no" on the interview sheet.[3] The suppression judge at this point asked several questions to clarify the testimony. Appellant's counsel asked no questions about this matter on cross-examination, but did bring out that there was a second officer, Detective Michael McKay, present during some of the interrogation. When the suppression judge learned in response to his own questions that Detective McKay had also filled out an interview sheet and that Detective Winston had not noted McKay's presence on his chronology sheet, the judge remarked that these circumstances were "a bit unusual in my experience." N.T. (Suppression Hearing) 88.

**3.** Detective Winston also testified that appellant was awake, alert, and lucid; that she did not appear to be under the influence of drugs or intoxicants; and that after the statement had been taken down and appellant had signed it, appellant read her statement into a tape recorder. In addition, appellant's written statement on the interview sheet contains the following:

"Q. Is there anything you wish to add?
A. I can't think of anything.
Q. Have you been treated fairly by the Police?
A. Yes, I have been.
Q. Do you have any complaints?
A. No, I have no complaints with the Police."

Commonwealth's Exhibit 4, at 4. Evidence at the suppression hearing also established that appellant had made a spontaneous inculpatory statement to the officer who entered the house after the homicide occurred, and that she had made, after a waiver of her *Miranda* rights, an inculpatory statement to another detective before her interrogation by Detective Winston.

After a recess, Detective McKay took the stand and testified that he was in the interview room for training and observation purposes, since he had just been assigned to the Homicide Unit, and that he prepared an interview sheet so that he "could compare later and see where I was possibly making mistakes." N.T. (Suppression Hearing) 107. The assistant district attorney did not question Detective McKay about his record or recollection of appellant's answers to the *Miranda* questions. The suppression judge then began a series of questions, to which appellant's counsel objected. In answer to one question McKay testified that he had recorded Ms. Seabrook's response to the seventh *Miranda* warning as "yes." The court then asked additional questions concerned with what the detective had heard and the accuracy of his record.[4] Appellant argues that this and other conduct of the

4. The colloquy between the judge and witness was as follows:
"BY THE COURT:
Q. Are you certain it is that which you heard—yes, to Number 7 question?
A. Your Honor, I wrote yes, but I can't—
Q. Very well, you wrote yes.
A. To be—
Q. Indicating that is what you heard?
A. What I believe the answer was.
Q. Very well. I only asked you a question, yes or no. That is what you heard.
   Now, 'Warnings given by Detective McKay,' above those answers—do you see that?
A. Yes, sir.
Q. Is that true?
A. Yes, sir, I did.
Q. You gave warnings?
A. I was present when the warnings were given.
Q. That is not what I asked you, Detective. Did you give this defendant warnings? You.
A. I did not read the card to the defendant, no, sir.
Q. But you have written down here that you did give the warnings.
A. Your Honor, I believe those were just to be my notes for comparison with the detailed interview later, for instructional purposes.
Q. I see.
A. I did not know that they were going to become part of the case and be used in court.

suppression judge reveals his pro-prosecution bias and his advocacy of the Commonwealth's case. We are thus asked to conclude that the court's refusal to suppress the defendant's statement was the product of this bias, and that due process requires a new trial. We disagree.

## II.

■ "The practice of a judge entering into the trial of a case as an advocate is emphatically disapproved. The judge occupies an exalted and dignified position; he is the one person to whom the jury, with rare exceptions, looks for guidance, and from whom the litigants expect absolute impartiality." *Commonwealth v. Myma*, 278 Pa. 505, 508, 123 A. 486, 487 (1924). This statement by Mr. Justice (later Chief Justice) Kephart, speaking for this Court, retains its importance over fifty years later.[5] But it does not mean that a judge, especially when he sits as a finder of fact, is to be no more than a mechanical instrument into which the parties feed testimony. An additional passage from *Myma, supra*, explains the point:

> Q. Which leads me to my next question. Is your C–6 taking of what this defendant said witnessed or signatured by—signed by this defendant.
> A. No, sir, it is not.
> Q. Why is that?
> A. Again, your Honor, it was merely my notes for myself so that I could compare later and see where I was possibly making mistakes.
> Q. Very well. As you have said before, you did not intend this instrument marked C–6 ever to be used as a primary piece of evidence?
> A. That's correct, your Honor. It was just sitting in and observing.
>     THE COURT: Very well. That is all I have.
>     MR. ROSENWALD [Defense counsel]: If I may ask several questions, your Honor.
>     THE COURT: You certainly may." N.T. (Suppression Hearing) 100–102.

5. See, e. g., *Commonwealth v. Laws*, 474 Pa. 318, 378 A.2d 812 [J. 190 of 1976, decided September 28, 1977]. *Laws*, however, has no application to the instant case. There is no contention here that the suppression judge's questions improperly pressured a witness into changing his testimony, as was found by this Court in *Laws*.

"A judge in a jury trial has a right to interrogate witnesses. It sometimes becomes his duty to do so, even to the point of recalling a witness to supply an omission of proof on a material point [citations omitted]. But a judge may so conduct an examination as to make it an abuse of discretion, requiring a new trial.

"Witnesses should be interrogated by the judge only when he conceives the interest of justice so requires. It is better to permit counsel to bring out the evidence and clear up disputed points on cross-examination unaided by the court; but where an important fact is indefinite or a disputed point needs to be clarified, the court may see that it is done by taking part in the examination. . . . Judges should refrain from extended examination of witnesses; they should not, during the trial, indicate an opinion on the merits, a doubt as to the witnesses's credibility, or do anything to indicate a leaning to one side or the other, without explaining to the jury that all these matters are for them." 278 Pa. at 507–08, 123 A. at 487.

Here Mr. Justice Kephart anticipated the American Bar Association's Standards Relating to the Function of the Trial Judge § 1.1(a) (Approved Draft, 1972):

"The trial judge has the responsibility for safeguarding both the rights of the accused and the interests of the public in the administration of criminal justice. The adversary nature of the proceedings does not relieve the trial judge of the obligation of raising on his own initiative, at all appropriate times and in an appropriate manner, matters which may significantly promote a just determination of the trial."

Thus, in *Myma, supra,* it was proper for the trial judge to ask questions on facts which "did not appear from either counsel's examination" and which "had a tendency to enlighten the jury." 278 Pa. at 509, 123 A. at 487. See also, *Commonwealth v. Miller,* 442 Pa. 95, 275 A.2d 328 (1971); *Commonwealth v. Brown,* 438 Pa. 52, 62–63, 265 A.2d 101 (1970); *Commonwealth v. Patskin,* 372 Pa. 402, 417–19, 93 A.2d 704 (1953).

██ In essence, then, the question is whether the trial court has abused its discretion. *Commonwealth v. Myma, supra; Commonwealth v. Patskin, supra.* "It is always the right and sometimes the duty of a trial judge to interrogate witnesses, although, of course, questioning from the bench should not show bias or feeling nor be unduly protracted." *Commonwealth v. Watts,* 358 Pa. 92, 96, 56 A.2d 81, 83 (1948).[6] A major reason for the restrictions on a trial judge's questioning is the concern that his conduct may lead the jury to conclude that the court has made up its mind on the question of the defendant's guilt, and that the jury should follow the judge's opinion. See, e. g., *Commonwealth v. McCoy,* 401 Pa. 100, 162 A.2d 636 (1960); *Commonwealth v. Claiborne,* 175 Pa.Super. 42, 102 A.2d 900 (1953). That consideration, of course, is not present in a bench trial or a suppression hearing. Nevertheless, even in those situations, "questioning from the bench should not show bias or feeling nor be unduly protracted," *Commonwealth v. Watts, supra.* This is not because of what might be intimated to a non-existent jury but because the parties are entitled to a fair fact-finder who, while not allowing himself to be put in a straightjacket by the adversary system, does not attempt to banish the restraints of that system from the courtroom.

**6.** As the commentary to the ABA Standards, *supra,* explains:
"[T]he adversary process, with all its shortcomings, is to be preferred as a procedure by which substantial justice can be attained in litigated cases. But the adversary process should not be regarded as sacred, and it is the proper role and function of the trial judge to exercise his judicial powers in such manner as to give the jury opportunity to decide the case free from irrelevant issues and appeals to passion and prejudice. In addition, it is appropriate for him from time to time to intervene in the conduct of the case. Thus, when it clearly appears to him that for one reason or another the case is not being presented intelligibly to the jury, the judge is not required to remain silent. On the contrary, he may by question to a witness elicit relevant and important facts. He may interrogate a witness after a cross-examination which appears to be misleading to the jury. . . . The judge should be aware that there may be greater risk of prejudice from over-intervention than from under-intervention. While he should not hesitate to exercise his authority when necessary, he should avoid trying the case for the lawyers." *Id.* at 26–27 (citations omitted).

### III.

Applying these standards to the record in this case, we cannot say that the suppression judge's conduct constituted an abuse of discretion or manifested bias. The questioning objected to was not "unduly protracted"; it occupied but three and one-half pages in a 107-page record. Similarly, we reject appellant's contention that the suppression judge's questions manifest a desire for a specific answer and show biased behavior. We need not and do not decide whether we would have drawn the inference, as the suppression judge apparently did, that the waiver which Detective McKay recorded was what he actually heard; it is enough that he could rationally draw that inference. And it is hard to see how any finding of bias can be made when the judge immediately followed up certain questions, the answers to which helped the Commonwealth's case, with questions that focused further on the accuracy of Detective McKay's recording, the answers to which did the Commonwealth's case no good.[7]

Appellant contends that the questioning was improper because it served to produce answers that enabled the Commonwealth to satisfy its burden of proof. Of course, we cannot read the suppression judge's mind as he weighed the evidence, although the record does indicate that he was disturbed by the discrepancies between what was recorded on Detective Winston's interview sheet and what was said in Winston's testimony. But even if the testimony elicited from Detective McKay played an important part in resolving the matter, there was no error in the circumstanc-

---

7. It is noteworthy that appellant does not contend that counsel's cross-examination of Detective McKay, which followed the court's questions, was improperly restricted. Nor could the record support such a contention. In addition, we do not read the comments of the suppression judge during and at the conclusion of the hearing as showing bias. Although the judge's expressions of his inferences might raise a problem had they been made during a jury trial, they cannot be deemed to show a predisposition at a suppression hearing to decide against appellant no matter what the evidence was.

es of this case. As we noted in *Commonwealth v. Patskin, supra,* 372 Pa. at 402, 93 A.2d at 713: " 'The purpose of a criminal trial is to ascertain the truth and it is the business of the Trial Judge to see that this end is obtained even if it necessitates his interrogation of witnesses to clear up some doubtful fact.' " (Emphasis deleted).[8] Here the suppression judge acted properly, and indeed commendably, to satisfy himself that appellant's waiver was knowing and intelligent and her statement voluntary.[9]

In sum, we hold that the suppression judge's conduct of the suppression hearing in this case did not constitute an abuse of discretion or deprive appellant of a fair trial on the merits. We therefore affirm the judgment of sentence.

NIX and MANDERINO, JJ., concur in the result.

JONES, former C. J., and ROBERTS, J., did not participate in the consideration or decision of this case.

**8.** We note that appellant does not attack the sufficiency of the evidence supporting the suppression court's finding that appellant made a valid waiver of her *Miranda* rights, and even if the suppression judge had fully disregarded the testimony of Detective McKay, we would not hesitate, given the other evidence, see note 3 *supra*, to conclude that the suppression court could properly find by a preponderance of the evidence that there was a valid waiver here. See, e. g., *Commonwealth v. Kichline,* 468 Pa. 265, 277–81, 361 A.2d 282, 289–91 (1976).

**9.** All the testimony elicited in this suppression hearing was subject to further development and cross-examination by counsel. Thus, cases such as *Commonwealth v. Minnick,* 432 Pa. 462, 247 A.2d 569 (1968), cited by appellant, in which we condemned the consideration of evidence not of record by lower courts, are inapplicable.

Because of our disposition we do not reach the question of whether the admission of appellant's statement at trial was harmless error because appellant took the witness stand and substantially repeated her statement in her testimony. See, e. g., *Commonwealth v. Saunders,* 459 Pa. 677, 331 A.2d 193 (1975).