J-S39006-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| GENE BROWN, | |
| Appellant | No. 788 WDA 2016 |

Appeal from the Judgment of Sentence Entered February 17, 2016
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0000981-2015

BEFORE: BENDER, P.J.E., BOWES, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED AUGUST 1, 2017**

Appellant, Gene Brown, appeals from the judgment of sentence of 3½ to 7 years' incarceration, followed by 5 years' probation, imposed after he was convicted, following a non-jury trial, of robbery (threat of serious bodily injury), 18 Pa.C.S. § 3701(a)(1)(ii), and conspiracy to commit robbery, 18 Pa.C.S. § 903(a)(1). After careful review, we affirm.

The facts of this case can be summarized as follows. At approximately 10 p.m. on December 14, 2014, Andrew Latterner, a white male, was smoking a cigarette at the intersection of Iowa and Bryn Mawr Streets in the Hill District Section of the City of Pittsburgh. N.T. Trial, 11/16/15, at 8. As he smoked, Latterner was approached by a group of two men and one

_____

[*] Retired Senior Judge assigned to the Superior Court.

female, all African-American, who encircled Latterner. *Id.* at 9, 12. One of the men, identified at trial by Latterner as Appellant, stood in front of Latterner and pulled out a rifle-type gun, which he pointed at Latterner's chest. *Id.* at 12, 14, 14. When Latterner raised his arms, Appellant directed the other male to check Latterner's pockets. *Id.* at 12. Appellant then asked Latterner if he had a car, and Latterner replied that he did not. *Id.* at 14. Appellant also asked if Latterner listened to music, and Latterner told him that his cell phone - on which he would have listened to music - was at his home. *Id.* Ultimately, Appellant and his cohorts took $40 from Latterner's wallet and fled. *Id.* at 15.

Latterner testified that during the two-minute robbery, he was looking at Appellant's face as Appellant talked to him. *Id.* at 16, 17. Latterner explained that Appellant was not wearing a mask, and he could see Appellant's face, even though Appellant had the hood of his sweatshirt up. *Id.* at 16. He also stated that the street was lit by a street light and "ambient light from the houses around [him]." *Id.* at 17.

After the robbery, Latterner called the police, who responded to the scene and searched the area, but were unable to locate Appellant and his cohorts. *Id.* at 18, 32. Latterner then traveled to Minnesota for several weeks. *Id.* at 18-19. When he returned, he met with police officers on

January 6, 2015. *Id.* at 19, 20.[1] The officers showed Latterner a photographic array, and told him it "might contain a suspect, [or] it might not." *Id.* at 19. After examining the photographs in the array for approximately one minute so he could "recall the details in [his] brain" and not "make any mistakes[,]" *id.* at 27, Latterner circled Appellant's picture because he remembered Appellant's face, *id.* at 21, 28. Latterner also identified Appellant as one of the robbers at Appellant's preliminary hearing, and he again identified him as the gun-wielding robber at trial. *Id.* at 11, 22.

The Commonwealth also introduced into evidence a prison telephone recording of a January 16, 2015 conversation between Appellant and his grandmother. *Id.* at 43. That conversation, in its entirety, was as follows:

[Appellant]: I need Naya's alibi, but the phone had hung up on me.

[Grandmother]: What Naya's alibi Gene?

[Appellant]: So that she could say I was with her on the 14th.

[Grandmother]: Was you with her?

[Appellant]: No.

_____

[1] Appellant's picture was included in that photographic array because he was stopped by police in the area of another robbery on December 27, 2014, and officers observed that he "fit the description of the [perpetrator of the] robbery that occurred to Andrew Latterner on December 14 of 2014. And [Appellant] lives near where [the Latterner] robbery occurred." *Id.* at 36, 37. Appellant was not arrested or charged in relation to the December 27, 2014 robbery. *Id.* at 37.

- 3 -

[Grandmother]: He don't know that they listen to every damn thing he says. Gene, whatever you talk about they can [YOU HAVE THIRTY SECONDS REMAINING]

[Appellant]: Alright, Grandma.

*See* Supplemental Transcript (filed with this Court on 3/20/17).

After the Commonwealth rested its case, Appellant called one witness, Dr. Jonathan Vallano, who testified as an expert on the reliability of eyewitness identification. N.T. Trial at 49, 51. Dr. Vallano testified that there are certain variables that can decrease the accuracy of eyewitness identification. In this case, some of the variables discussed by the doctor were present, such as the "low levels of illumination" because the robbery occurred at night, *id.* at 54; the presence of a weapon, which may have drawn Latterner's attention away from the robber's face and caused him fear or stress that impacted his focus, *id.* at 54-55, 56; Latterner's making a cross-racial identification, *id.* at 55; and the fact that Latterner's first identification of the robbery from a photographic array was made three weeks after the robbery, *id.* at 55-56.

At the close of the trial, the court found Appellant guilty of robbery and conspiracy. On February 17, 2016, the court sentenced him to the aggregate term stated *supra*. Appellant filed a timely post-sentence motion, which the court denied on May 4, 2016. Appellant then filed a timely notice of appeal, and he also timely complied with the trial court's order to file a Pa.R.A.P. 1925(b) statement. The court subsequently filed a Rule 1925(a) opinion. Herein, Appellant presents two issues for our review:

I. Did the trial court err in taking "judicial notice" of facts not of record; in essence, inferring details not in evidence by "reading between the lines" to create improper inferences that do not reasonably flow from the evidence presented?

II. Was the evidence presented at trial sufficient to support [Appellant's] convictions for robbery and conspiracy, in that the trial court, sitting as the fact-finder, based the guilty verdict on speculation, considered facts not in evidence, argued with the expert when the scientific evidence on eyewitness identification did not comport with [the court's] previously held beliefs, and speculated about certain inferences because he could hear things in the African-American grandmother's voice that others could not hear?

Appellant's Brief at 5.

Appellant divides his initial issue into two separate claims. First, he avers that the court improperly took 'judicial notice' of certain facts that were not supported by the evidence. Second, Appellant maintains that the court erred in questioning Dr. Vallano. Preliminarily, we note that Appellant does not point to where he objected to either of these purported trial court errors. However, we recognize that in **Commonwealth v. Hammer**, 494 A.2d 1054 (Pa. 1985), *abrogated on other grounds by* **Commonwealth v. Grant**, 813 A.2d 726 (Pa. 2002), our Supreme Court relaxed "the waiver doctrine in the case of judicial intemperance[,] for counsel cannot veto actions viewed by the judge to be wholly permissible." **Id.** at 1060. The **Hammer** Court concluded that, because the record in that case evinced "that objection would [have been] meaningless to satisfy the reasons for raising objection and … indeed intensified judicial animosity, justice [would] not [be] served by the strict application of the waiver doctrine." **Id.** Accordingly, the Court held "that the failure of trial counsel to object to the

questioning by the judge, who is charged with a function of self-regulation, will not under all circumstances render the allegation of judicial impropriety unavailable for appellate review." *Id.*

In this case, we will apply the relaxed waiver doctrine of *Hammer*, and we will not deem the claims that Appellant proffers within his first issue waived. Accordingly, we will address those claims in turn.

Appellant begins by arguing that the trial court improperly took 'judicial notice' of certain facts when the court was interpreting the prison phone conversation between Appellant and his grandmother. Specifically, during defense counsel's closing argument, the court stated that there was a "cultural component" to its interpretation of Appellant's conversation with his grandmother.[2] N.T. Trial at 71. The court then explained that it understood Appellant's remarks during the conversation as Appellant's "telling [his grandmother to], 'Find [him] a way to get out of here. Find someone who will lie to get [him] out of here.'" *Id.* at 72. The court also interpreted the call as including a question from Appellant's grandmother about whether Appellant was caught with a gun. *Id.* (the trial court's stating, "She was asking him some questions. 'Did they catch you with the gun?' That means something."). Appellant complains that the court's application of a 'cultural

_____

[2] Appellant interprets the court's remark about a "cultural component" as referring to the fact that Appellant, his grandmother, and the trial judge are all African-American. *See* Appellant's Brief at 28 n.5.

component' was improper, and that it led to the court's taking 'judicial notice' of facts not supported by the actual content of the phone call, or by any other evidence at trial.

Preliminarily, we note that the trial court never stated that it was taking 'judicial notice' of any fact(s). Rather, the court explained that it was drawing inferences from the statements made by Appellant and his grandmother during the phone call. Therefore, we must assess whether those inferences were reasonable. In regard to the court's inferring that Appellant was asking his grandmother to find someone to lie for him, we do not consider the court's interpretation to be off mark. Notably, Appellant told his grandmother that he needed 'Naya' to say he was with her on the '14th.' When his grandmother asked him if he had actually been with 'Naya,' Appellant said no. It was reasonable for the court to infer, from those remarks, that Appellant was attempting to fabricate an alibi for the robbery that occurred on December 14, 2014, and that he was seeking assistance from his grandmother in that endeavor. Therefore, we see no error in regard to the court's inference that Appellant was trying to find someone to lie for him.

Next, Appellant avers that it was unreasonable for the court to conclude that his grandmother asked him whether he was caught with the gun. We are compelled to agree. Nothing in Appellant's grandmother's statements could be interpreted as her asking, or even implying, such a question. In fact, it seems the court may have simply been

misremembering the content of the call. In any event, we must agree with Appellant that no evidence supported that inference and, therefore, it was unreasonable.

Nevertheless, we agree with the Commonwealth that the court's erroneous interpretation of this fact was harmless error that did not contribute to the court's verdict. Our Supreme Court has declared:

> It is well settled that "an appellate court has the ability to affirm a valid judgment or verdict for any reason appearing as of record." **Commonwealth v. Parker**, 591 Pa. 526, 534–35, 919 A.2d 943, 948 (2007) (citing **Commonwealth v. Katze**, 540 Pa. 416, 658 A.2d 345 (1995) (Opinion in Support of Affirmance)). As we explained in **Commonwealth v. Thornton**,
>
>> [t]he doctrine of harmless error is a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt. Its purpose is premised on the well-settled proposition that "[a] defendant is entitled to a fair trial but not a perfect one."
>
> 494 Pa. 260, 266, 431 A.2d 248, 251 (1981). This Court may affirm a judgment based on harmless error even if such an argument is not raised by the parties.

**Commonwealth v. Allshouse**, 36 A.3d 163, 182 (Pa. 2012) (footnote omitted).

Here, it is apparent that the trial court's improper conclusion that Appellant's grandmother asked him if he was caught with the gun did not impact the court's verdict and, therefore, the error was harmless beyond a reasonable doubt. Just before the court rendered its verdict of guilt, it repeatedly stressed that it found Andrew Latterner's testimony and

identification of Appellant to be "perfectly credible." N.T. Trial at 88, 89. While the court mentioned "[t]hat the phone call affected it[,]" the court did not elaborate on that remark in any way; instead, the court immediately returned to its discussion of why it found Latterner to be credible. *Id.* at 88. At no point did the court refer to its erroneous interpretation of the prison phone call as including a question from the grandmother about whether Appellant was caught with the gun.

We also note that in its opinion and order denying Appellant's post-sentence motion for a new trial, the court again indicated that its verdict rested solely on the Latterner's identification of Appellant as the gun-wielding robber. Specifically, the court stated: "Evidence from a single witness - if believed - can sustain a verdict. ***This is one of those cases***." Memorandum Opinion and Order, 5/4/16, at 2 (emphasis added). Additionally, in its Rule 1925(a) opinion, the court reiterates that Latterner's credibility was the basis for its convicting Appellant. ***See*** Trial Court Opinion, 9/19/16, at 2 ("[T]he [c]ourt believed the victim. The [c]ourt found Mr. Andrew Latterner from Minnesota to be a very credible witness."). Based on this record, it is clear that the court's verdict did not rest - in whole or even in part - on the fact that the court believed Appellant's grandmother asked him if he was caught with the gun. Thus, the court's error in drawing this erroneous inference from the phone conversation was harmless.

The second claim Appellant presents within his first issue is that the court erred by questioning the defense's expert witness, Dr. Vallano. Appellant explains his claim, as follows:

[B]efore the expert witness, Dr. Vallano, began a presentation on the science surrounding the field of eyewitness testimony, [the trial court] interjected [its] own thoughts and understanding about the subject. Then, after examination by defense counsel, the court conducted its own examination of the expert.

A large portion of the court's questioning revolved around the idea of cross-racial identification. Specifically, the court inquired, "What if on this [cross-]racial identification, what if the party that was identifying, although may be of a different race, what if he grew up with the race he was identifying? Would that make a difference?" NT at 60. "For instance, what if I grew up in China. Would I be better at identifying Chinese than my brother who grew up in Manchester?" *Id.* Dr. Vallano replied, "[A]t this point in the literature, we're not really sure if [that] exists." [*Id.*] at 60-61.

Continuing in that vein, the court asked, "What about this. What about a Chinese guy who grew up in Harlem? Would he be better if he went to China at identifying a Chinese guy than a black guy?" [*Id.* at] 62. Dr. Vallano's response was, "[T]he research is inconclusive." *Id.* To this, the court replied, "The point I'm making is that the research is really shabby. The point that you're getting to, that you're making this definitive answer about, around … [cross-]racial identification, there is very little reliable information at all other than --." *Id.* The examination by the court extends for several pages in the transcript. [*Id.* at] 60-66.

Appellant's Brief at 34-35.

While Appellant recognizes that "a trial court may, at times, question a testifying witness to clarify a witness's testimony[,]" *id.* (citing ***Commonwealth v. Hogentogler***, 53 A.3d 866, 880 (Pa. Super. 2012), he

nevertheless argues that the court's "extensive examination" of Dr. Vallano amounted to the court's "enter[ing] the case as an advocate." Appellant's Brief at 37. Appellant also avers that the court was predisposed to disbelieving the defense's expert, as the court held a "pre-conceived notion that the Caucasian victim in this case, who lived in a primarily African-American neighborhood, would not have the same difficulties with identifying his attacker as every other Caucasian." *Id.* at 36. According to Appellant, "[t]he court seemed to ignore the expert witness when his testimony conflicted with the [court's] pre-conceived notions relating to the accuracy of eyewitness testimony[,]" and, thus, the court failed to "remain an impartial arbiter of the facts of this case." *Id.* at 37.

We begin by recognizing that,

[i]t is always the right and sometimes the duty of a trial judge to interrogate witnesses, although, of course, questioning from the bench should not show bias or feeling nor be unduly protracted. A major reason for the restrictions on a trial judge's questioning is the concern that his conduct may lead the jury to conclude that the court has made up its mind on the question of the defendant's guilt, and that the jury should follow the judge's opinion. That consideration, of course, is not present in a bench trial or a suppression hearing. Nevertheless, even in those situations, "questioning from the bench should not show bias or feeling nor be unduly protracted[.]" This is not because of what might be intimated to a non-existent jury but because the parties are entitled to a fair fact-finder who, while not allowing himself to be put in a straightjacket by the adversary system, does not attempt to banish the restraints of that system from the courtroom.

***Commonwealth v. Seabrook***, 379 A.2d 564, 567–68 (Pa. 1977) (citations and quotation marks omitted).

- 11 -

Here, while we acknowledge the court's questioning of Dr. Vallano was needlessly lengthy, we agree with the Commonwealth that nothing in the court's questioning indicated any **bias** against the defense, or that the court had made a predetermined decision not to believe the doctor's testimony. Rather, it is apparent from the record that the court asked questions to clarify Dr. Vallano's opinion about the scientific findings in the area of cross-racial identification, and how those findings should impact the court's credibility determination regarding Latterner's identification in this case. The trial court's explanation in its opinion supports this interpretation of the record:

> A detached reading of the expert's testimony will show [that] the [c]ourt, fueled by its fascination of how the law and science evolve, posed questions which furthered the inquiry and allowed the expert to demonstrate his expertise on the topic. The [c]ourt understood what the expert was saying. The [c]ourt understands the underlying social science and its current limitations. But, that understanding does not equal a defense verdict. The [c]ourt found the single witness identification to triumph over the defense[-]generated expert evidence.

TCO at 3-4. Given our review of the record, and the court's discussion in its opinion, we ascertain no reversible error in the court's questioning of Dr. Vallano. Thus, Appellant's first issue is meritless.

In Appellant's second issue, he challenges the sufficiency of the evidence to support his convictions for robbery and conspiracy.

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. *Commonwealth v. Moreno*, 14 A.3d

133 (Pa. Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. **Commonwealth v. Hartzell**, 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. **Moreno, supra** at 136.

**Commonwealth v. Koch**, 39 A.3d 996, 1001 (Pa. Super. 2011).

To prove Appellant committed robbery in this case, the Commonwealth was required to demonstrate that he "threaten[ed] another with or intentionally put[] him in fear of immediate serious bodily injury[.]" 18 Pa.C.S. § 3701(a)(1)(ii). Additionally, "[a] conviction for criminal conspiracy, 18 Pa.C.S. § 903, is sustained where the Commonwealth establishes that the defendant entered an agreement to commit or aid in an unlawful act with another person or persons with a shared criminal intent and an overt act was done in furtherance of the conspiracy." **Commonwealth v. Lambert**, 795 A.2d 1010, 1016 (Pa. Super. 2002) (citations omitted).

Here, Appellant solely argues that the evidence was insufficient to sustain either of these convictions because "the Commonwealth failed to prove his identity as the culprit beyond a reasonable doubt." Appellant's Brief at 42. As Appellant recognizes,

[i]n determining whether a particular identification was reliable, the court "should consider the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [his or her] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. The opportunity of the witness to view the actor at the time of the crime is the key factor in the totality of the

- 13 -

circumstances analysis." ***Commonwealth v. Bruce***, 717 A.2d 1033, 1037 (Pa. Super. 1998) (citations omitted).

> [E]vidence of identification need not be positive and certain to sustain a conviction. Although common items of clothing and general physical characteristics are usually insufficient to support a conviction, such evidence can be used as other circumstances to establish the identity of a perpetrator. Out-of-court identifications are relevant to our review of sufficiency of the evidence claims, particularly when they are given without hesitation shortly after the crime while memories were fresh. Given additional evidentiary circumstances, any indefiniteness and uncertainty in the identification testimony goes to its weight.

***Commonwealth v. Valentine***, 101 A.3d 801, 806 (Pa. Super. 20014) (quoting ***Commonwealth v. Orr***, 38 A.3d 868, 874 (Pa. Super. 2011)).

Appellant claims that in this case, the court should have found Latterner's identification unreliable because three weeks had passed before Latterner picked Appellant from the photographic array, the presence of a gun during the robbery likely drew Latterner's focus away from the face of the robber, and cross-racial identifications are necessarily less reliable. Appellant also notes that Latterner did not give a specific description of his assailants to police, only stating that the gun-wielding robber was a black man who was taller than 5'5", and who was wearing black sweatpants and a dark blue hooded sweatshirt. ***See*** Appellant's Brief at 44.

Additionally, Appellant avers that Latterner's identification of him at the preliminary hearing was not compelling, where Appellant "was the only person in the room other than the attorneys," and Latterner "may have identified [Appellant] at the preliminary hearing because he remembered

seeing the photo (not the gunman) before…." *Id.* at 45. Appellant presents a similar argument in challenging the credibility of Latterner's identification of him at trial, claiming that Latterner "may have identified [Appellant] at trial because he remembered him from the preliminary hearing, not because he remembered [Appellant] as the gunman." *Id.* at 45-46.

Finally, Appellant reiterates the arguments presented in his first issue, claiming that the trial court "bas[ed] the guilty verdict on evidence that simply was[ not] there -- evidence that the court inferred from the call to [Appellant's] grandmother." *Id.* at 48. Therefore, in Appellant's view, "the verdict herein [was] largely based upon speculation and surmise" and, thus, it must be reversed. *Id.* at 49.

Appellant's arguments are unconvincing. Initially, we will not rehash our discussion of his claim that the trial court relied on a fact not supported by the evidence in reaching its verdict, as it is clear the court focused on Latterner's identification in convicting Appellant, not its interpretation of the prison phone call between him and his grandmother. Moreover, in our view, the totality of the circumstances surrounding Latterner's identification of Appellant permitted the court to find it credible. Latterner testified that, while Appellant had the hood of his sweatshirt pulled up, Latterner was able to see his face during the two-minute robbery. The street was lit by a streetlight, and by lights from the houses on the street. Appellant asked Latterner questions during the robbery, and Latterner testified that he "was looking at [Appellant's] face" as Appellant spoke to him. N.T. Trial at 16.

Latterner later testified on redirect examination that he was not looking at the gun when speaking with Appellant, but he was instead looking at Appellant's face. *Id.* at 28.

Moreover, while Latterner did not identify Appellant in the photographic array until three weeks after the robbery, his identification at that point was certain. Specifically, Latterner testified that he examined the photographs for approximately one minute as he "recalled the details" of the robbery "so [he] didn't make any mistakes." *Id.* at 27. He then selected Appellant's photograph because he recognized Appellant's face. *Id.* The officers who presented the array informed Latterner that the array might, or might not, contain a suspect, and Latterner did not feel that he "had to select a photo[.]" *Id.* at 19. Latterner also testified that he identified Appellant at the preliminary hearing, and he did not waiver when identifying Appellant at trial as the gun-wielding robber. *Id.* at 10-11, 22.

The totality of the circumstances surrounding Latterner's out-of-court identification of Appellant were sufficient to permit the court to find it credible, especially considering that Latterner remained consistent in identifying Appellant at the preliminary hearing and at trial. While Dr. Vallano testified that certain factors in this case could have impacted the accuracy of Latterner's identification, the trial court was free to reject that testimony and believe Latterner's claim that Appellant was one of the people who robbed him. Based on Latterner's identification of Appellant and his

testimony about the robbery, the evidence was sufficient to support Appellant's convictions.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/1/2017