J-S02018-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MICHAEL VANN | : | |
| | : | |
| Appellant | : | No. 432 EDA 2025 |

Appeal from the PCRA Order Entered January 30, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002081-2020

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MICHAEL VANN | : | |
| | : | |
| Appellant | : | No. 433 EDA 2025 |

Appeal from the PCRA Order Entered January 30, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003166-2020

BEFORE:  NICHOLS, J., MURRAY, J., and BENDER, P.J.E.

MEMORANDUM BY MURRAY, J.:                    **FILED FEBRUARY 26, 2026**

Michael Vann (Appellant) appeals from the order denying his first petition for relief filed pursuant to the Post Conviction Relief Act ("PCRA").[1] After careful consideration, we affirm.

---

[1] 42 Pa.C.S.A. §§ 9541-9546.

In August 2019, at docket number CP-51-CR-0002081-2020 (the assault docket), Appellant was arrested and charged with aggravated assault, simple assault, and recklessly endangering another person (REAP).[2] These charges arose from injuries sustained by Appellant's mother, Theola Vann Allen (Allen or Mrs. Allen), while she was in Appellant's care.[3]

In March 2020, at docket number CP-51-CR-0003166-2020 (the harassment docket), the Commonwealth charged Appellant with one count of intimidation of a witness; two counts of terroristic threats; and three counts of harassment.[4] These charges arose from Appellant's threatening of a witness in the assault case. The trial court subsequently consolidated the cases.

In May 2021, after a colloquy conducted by the Honorable Vincent L. Johnson (Judge Johnson), Appellant waived his right to a jury trial. N.T., 5/13/21, at 5-8. During the colloquy, however, Judge Johnson made no mention of the fact that the judge previously acted as the primary caregiver for his own mother, who also had suffered from dementia.

The matter proceeded to a bench trial. As this Court described on direct appeal,

_____

[2] 18 Pa.C.S.A. §§ 2702(a), 2701(a), 2705.

[3] Appellant's mother suffers from dementia.

[4] 18 Pa.C.S.A. §§ 4953, 2706(a)(1), 2709(a)(4).

- 2 -

[t]he Commonwealth first presented the testimony of [Appellant's] mother, [] Allen. Allen testified that on the day that she was taken from her home by [emergency medical services], she had been injured when [Appellant] slapped her face. [N.T., 5/13/21,] at 10. She further testified that [Appellant] pushed her. *Id.* at 11. She did not recall how many times [Appellant] slapped her. *Id.* at 10. Allen testified she has used a wheelchair since the incident. *Id.* at 12….

*Commonwealth v. Vann*, 304 A.3d 722, Nos. 22502 & 2503 EDA 2021 (Pa. Super. filed Aug. 2, 2023) (unpublished memorandum at 2-3). The Commonwealth also presented the testimony of Allen's home health aide, Marsha Conway (Ms. Conway); and Allen's granddaughter, Tawanna Vann (Tawanna). Appellant testified on his own behalf, and also presented the testimony of his fiancé, Carla Hall (Ms. Hall).

The trial court previously provided the following factual history of this case:

[Mrs. Allen] is an eighty-one-year-old woman who suffers from dementia. [Appellant,] along with help from a health care aide, took care of Mrs. Allen. [Appellant] and Mrs. Allen have a checkered history of verbal and physical forms of domestic violence.

Prior to July 9, 2019, Mrs. Allen and [Appellant] resided at 1500 Allison Street, Philadelphia, PA. Currently, Mrs. Allen resides in a nursing home where she is now wheelchair bound.

During the day of July [9], 2019, [Appellant's] fiancé, [Ms.] Hall, took Mrs. Allen out for ice cream. In the evening, [Ms.] Hall brought Mrs. Allen back home and let Mrs. Allen out of the car in front of [her] home[,] while [Ms.] Hall went to park the car. [Ms.] Hall claims that Mrs. Allen "did a 360 [degree] change" when Mrs. Allen arrived at her home.

[Appellant] and his mother became engaged in an argument with each other. Mrs. Allen and [Appellant] claim this argument was

- 3 -

caused by two different things. Mrs. Allen claimed that she would not allow [Appellant] to have women sleep over her house. [Appellant] alleged the argument started because he made a comment about Mrs. Allen's deceased husband. This argument turned into Mrs. Allen threatening and chasing [Appellant] around the home. During this argument, Mrs. Allen followed [Appellant] upstairs. While upstairs, Mrs. Allen "was pushed down by [Appellant]".

[Appellant] then struck Mrs. Allen with an open hand, causing Mrs. Allen to fall, and causing Mrs. Allen to break her left hip. Mrs. Allen became wheelchair bound from this injury.

Trial Court Opinion, 8/17/22, at 3-4 (citations omitted).

At trial, Ms. Conway, Allen's home health aide, testified that she

arrived at Mrs. Allen's residence the following day, July 10, 2019, at approximately 12:40 [p.m.] [Ms. Conway] arrived early and heard movement taking place within the house. After twenty minutes, [Appellant] opened the door and told [Ms. Conway] that she was not allowed in because [Appellant] had "had it out" with Mrs. Allen. [Ms. Conway] saw that the house was in "disarray." … Upon seeing the house in "disarray," [Ms. Conway] ignored [Appellant] and went upstairs to find Mrs. Allen laying on the floor. [Ms. Conway] asked Mrs. Allen if she would like to call the police. Mrs. Allen informed [Ms. Conway] that the police were "here at 4 o'clock in the morning" and the police "were not going to do nothing." Mrs. Allen stressed multiple times to [Ms. Conway] to not call the police because [police had] already [been] there. However, evidence was introduced by way of stipulation; this evidence showed no record of police at Mrs. Allen's home when [Appellant] and [Ms.] Hall claimed police were there. Additionally, while Ms. Conway was speaking with Mrs. Allen, [Appellant] was within a close proximity and could monitor the conversation between Mrs. Allen and [Ms. Conway]. Moreover, Mrs. Allen gave the impression to [Ms. Conway] that she was afraid of [Appellant].

While [Ms. Conway] was at Mrs. Allen's home, [Ms. Conway] called Mrs. Allen's granddaughter, Tawanna[.] Tawanna was called because Tawanna is Mrs. Allen's Power of Attorney. Tawanna asked Mrs. Allen why she was on the floor; Mrs. Allen told Tawanna that "[Appellant] had beat her up."

After the phone call between Mrs. Allen and Tawanna, [Appellant] asked [Ms. Conway] to help clean up the house. After helping [Appellant to] clean up the house, [Ms. Conway] went to check on Mrs. Allen again. Unable to lift Mrs. Allen up on her own, [Ms. Conway] asked [Appellant] to help Mrs. Allen; [Appellant] refused to help. Mrs. Allen continued to give the impression to [Ms. Conway] that she was afraid of [Appellant]. [Ms. Conway] helped wash Mrs. Allen while Mrs. Allen was on the floor. Roughly 15 minutes prior to [Ms. Conway] leaving, … [Ms. Hall,] arrived. [Ms. Hall] claims she arrived at Mrs. Allen's home at around 4[:00 p.m.], contrary to [Ms. Conway's] testimony that [Ms. Hall] arrived at roughly 5:45 [p.m.] … [Ms. Hall] called the ambulance[,] which took Mrs. Allen to [Mainline Health] Lankeanu Hospital.

The paramedic's notes indicated that they arrived on July 10, 2019, at approximately 7:00 [p.m.] The notes further state that the paramedics found an eighty-one[-]year[-]old female laying with her face upward on the ground.

**Id.** at 4-6 (citations omitted).

While at the hospital, photographs were taken of Mrs. Allen. As described by the trial court,

[t]hese photos show bruising on the fingers of Mrs. Allen, a bruise on her leg, a bruise around her eye, and bruises and marks around her neck. [Appellant] stated that these bruises and marks on Mrs. Allen's body and face were due to Mrs. Allen chasing and swinging at [Appellant] and falling while attacking [Appellant]. [Ms. Hall] asserted the following: the specific bruise on Mrs. Allen's face occurred when Mrs. Allen attempted to hit [Appellant] and Mrs. Allen fell and hit her face on a table; Mrs. Allen had fallen three times the night of July 10, and morning of July 11; and that these falls are the cause of Mrs. Allen's injuries.

….

On July 11, 2019, a [police] report was taken and … admitted [in]to evidence by way of stipulation. The report states that [Appellant] had grabbed Mrs. Allen by her neck, choked her, punched her in the right eye, and threw her to the ground[,] which

broke her hip. The report further states that [Appellant] has been abusive in the past, but that Mrs. Allen had not reported it.

While Mrs. Allen was at the hospital, a male nurse [telephoned] Tawanna. Tawanna told the male nurse that "[Appellant] beat [Mrs. Allen] up." After this phone call, a social worker approached [Appellant] and told [Appellant] that Tawanna called and said, "certain things." In response to Tawanna informing the nurse that [Appellant] beat up Mrs. Allen, [Appellant] called Tawanna and left multiple voicemails. In these voicemails, [Appellant] told Tawanna that he is "going to send people to touch you" and he has "put a check on [Tawanna's] head." Tawanna believed this was a threat in which [Appellant] was sending people to kill her. [Appellant] admitted to making the calls to Tawanna and stated that he was being "stupid" and that this was a "family dispute."

*Id.* at 6-7 (citations omitted).

At the trial's conclusion, the trial court convicted Appellant of all charges at the assault docket. At the harassment docket, the trial court convicted Appellant of two counts of terroristic threats and three counts of harassment. The trial court acquitted Appellant of intimidation of a witness. On November 9, 2021, the trial court sentenced Appellant to an aggregate prison term of 8-16 years, followed by 4 years of reporting probation. Appellant timely appealed. Following several procedural matters not relevant to this appeal, this Court ultimately affirmed Appellant's judgment of sentence on August 2, 2023. *Vann*, 304 A.3d 722 (unpublished memorandum at 23). Appellant did not petition for allowance of appeal to the Supreme Court.

On October 10, 2023, Appellant filed a timely *pro se* PCRA petition, his first. The PCRA court appointed counsel, who filed an amended PCRA petition on March 28, 2024. On September 27, 2024, the PCRA court issued

Pa.R.Crim.P. 907 notice of its intent to dismiss Appellant's PCRA petition without a hearing. On January 30, 2025, the PCRA court dismissed Appellant's PCRA petition, after which Appellant timely filed a notice of appeal. Appellant and the PCRA court have complied with Pa.R.A.P. 1925.

Appellant presents the following issue for our review:

Whether trial counsel[5] was ineffective for failing to request [that Judge Johnson] recuse himself due to [the] judge's emotional bias[;] and counsel failed to object to the judge's questioning.

Appellant's Brief at 7 (footnote added; capitalization modified).

When reviewing the dismissal of a PCRA petition, we examine "whether the PCRA court's ruling is supported by the record and free of legal error." **Commonwealth v. Hereford**, 334 A.3d 903, 907 (Pa. Super. 2025) (*en banc*) (citation omitted). The scope of our review "is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the PCRA court level." **Commonwealth v. Conforti**, 303 A.3d 715, 725 (Pa. 2023) (citation omitted). Appellate courts "grant great deference to the PCRA court's findings that are supported in the record." **Commonwealth v. Kapellusch**, 323 A.3d 837, 844 (Pa. Super. 2024) (citation omitted)). "[W]e review the PCRA court's legal conclusions *de novo*." **Commonwealth v. Harper**, 230 A.3d 1231, 1236 (Pa. Super. 2020) (citation omitted).

_____

[5] At trial, Appellant was represented by Alexander C. Blumenthal, Esquire (trial counsel), an attorney with the public defender's office.

Appellant argues that trial counsel rendered ineffective assistance by failing to request the recusal of the trial judge, Judge Johnson. Appellant's Brief at 19. Appellant asserts that trial counsel's "failure to request recusation was unreasonable because [Judge Johnson] showed clear bias against Appellant during his trial." *Id.* According to Appellant, "[t]he failure to make this request and the failure to object during [Judge Johnson's] biased questioning hindered Appellant's ability to challenge the fairness of the bench trial." *Id.* (punctuation modified).

In support of his claim, Appellant directs our attention to the following excerpt from trial counsel's cross-examination of Allen:

> Q: [Trial Counsel]: And you went — when you came after and you attacked your son[, Appellant] on that day? Do you remember that?
>
> A: [Allen]: Did I?
>
> Q: Do you remember charging at him?
>
> A: No.
>
> THE COURT: Can I talk to you in the back?
>
> (Whereupon there was a brief discussion on the record *in camera*.)
>
> THE COURT: Here's my problem. Nothing is wrong, except it hasn't been established that [Allen] has a problem with her memory. You're leading. [The Commonwealth is] letting you. It's fine with me.
>
> [Trial Counsel]: It's cross-examination.
>
> THE COURT: It's cross-examination, but I just want to make sure that [Ms. Allen's] okay. You know what I'm saying? We've

established that [Ms. Allen is] mentally fine. You gave that information to me.

[The Commonwealth]: She's well enough to testify.

THE COURT: I just want to make sure, because I don't want [Ms. Allen] in a situation where she'll say, I mean — you're permitted to lead on cross. I just want to make sure she's mentally fine. And I just want to establish that. We did that before. I just want to make sure. I don't want [Ms. Allen] to say yes to everything.

[The Commonwealth]: Your Honor, I think, as you can see, at least as my impression of the witness, and it's yours that, ultimately, matters, but she wouldn't let me lead her and she -- I mean, in the sense that I was –

THE COURT: You were fine.

[The Commonwealth]: And she's not letting [trial counsel] lead her.

THE COURT: Well, I mean, [trial counsel's] asking a leading question, and that's his right to.

[The Commonwealth]: Yes.

THE COURT: But the last question was, for example, [Allen] did stop you when you said, as a child, you know, she would slap [Appellant] but not as an adult. And your last question was what bothered me. Your last question was -- and I didn't get an answer from [Allen], but you asked whether or not she hit him. It was a pause with her, and it just concerned me. But I see where you're going from. It just bothered me because of her age, but we'll see where it goes.

[The Commonwealth]: Your Honor, I'm sensitive to this, too, but I'm also sensitive to making sure you have a full picture and letting him conduct his –

THE COURT: It's fine. I mean, as long as you're fine and her mental stability is okay. I'll see where this goes, and we'll see what happens at the end.

[The Commonwealth]: She always — I shouldn't characterize her, but I was comfortable with her, and I mean, we got to let her give her answers for better or worse from here.

THE COURT: She's doing okay. I just wanted to make sure what we're doing.

N.T., 5/13/21, at 19-21; *see* Appellant's Brief at 20-21 (quoting the transcript). Trial counsel did not object to the foregoing.

Appellant argues that Judge Johnson's concerns

were not grounded in evidence[,] but in his own experience. He repeatedly referred to his personal history caring for his mother, who had dementia. His emotional proximity to the facts of the case—expressed explicitly and repeatedly—would lead any reasonable observer to question [the judge's] impartiality.

Appellant's Brief at 21. In particular, Appellant points to the following statements by Judge Johnson:

I know for a fact that dementia patients … lay on the floor—they don't know why. … The multiple times my mother was on the floor, [paramedics] came. … It's outrageous for me to hear that someone laid on the floor for hours.

….

I can tell you that I witnessed that with my mother—and I'm an only child. … I took care of her. … I do believe it is difficult—I know—to deal with dementia or Alzheimer['s] patients.

*Id.* at 21-22 (quoting N.T., 5/13/21, at 181-86).

Appellant further argues that Judge Johnson improperly based his credibility determinations on his own experience, when Judge Johnson stated that Allen "testified to it with such credibility, with such sincerity, despite my fear of her not being able—because of her mental ability—to be swayed, but

she wasn't swayed." ***Id.*** at 22. According to Appellant, these remarks demonstrated that Judge Johnson "relied on personal, extra-record experience" to make his factual findings. ***Id.***

Appellant claims the ineffective assistance of trial counsel. In every ineffectiveness claim, a petitioner must "rebut the presumption that counsel rendered effective assistance and prove, by a preponderance of the evidence, that (1) the claim has arguable merit[;] (2) counsel's action or inaction was not based upon a reasonable trial strategy[;] and (3) petitioner suffered prejudice because of counsel's act or omission." ***Commonwealth v. Williams***, 141 A.3d 440, 454 (Pa. 2016). Failing to satisfy any prong of the above test is fatal to an ineffectiveness claim. ***Commonwealth v. Thomas***, 323 A.3d 611, 621 (Pa. 2024).

"In general, a motion to recuse is properly directed to and decided by the jurist whose participation the moving party is challenging." ***Commonwealth v. Watson***, 228 A.3d 928, 939 (Pa. Super. 2020). In applying this standard,

> [t]he inquiry is not whether a judge was in fact biased against the party moving for recusal, but whether, even if actual bias or prejudice is lacking, the conduct or statement of the court raises an appearance of impropriety. The rule is simply that disqualification of a judge is mandated whenever a significant minority of the lay community could reasonably question the court's impartiality.

***Commonwealth v. Druce***, 796 A.2d 321, 327 (Pa. Super. 2007) (internal quotation marks and citations omitted); ***accord Watson***, 228 A.3d at 939.

- 11 -

This Court has stated, "[t]here is no need to find actual prejudice, but rather, the appearance of prejudice is sufficient to warrant the grant of new proceedings." *Commonwealth v. Rhodes*, 990 A.2d 732, 748 (Pa. Super. 2009) (emphasis added).

Further, when judges serve as the finder of fact, the law presumes they will disregard inadmissible and/or prejudicial evidence. *See, e.g., Commonwealth v. Fears*, 836 A.2d 52, 71 n.19 (Pa. 2003) (holding that "a judge, as fact finder, is presumed to disregard inadmissible evidence and consider only competent evidence" (citation omitted)); *In re J.H.*, 737 A.2d 275, 279 (Pa. Super. 1999) (noting that in a proceeding where the judge is the fact finder, he or she is presumed to consider evidence for its proper purpose and "is equipped, through training and experience, to assess the competency and relevance of proffered evidence and to disregard that which is prejudicial" (citation omitted)).

The PCRA court[6] determined that Appellant's ineffectiveness argument lacked arguable merit:

> In this matter, the [trial] court has made comment about [the judge's] mother having dementia, but it is clear the court remained neutral and listened to the facts to come to its conclusion. The court even makes mention[,] from his own knowledge[,] to empathize with [Appellant] that [the trial] court knows that sometimes individuals with dementia will become violent and lay on the floor for periods at a time and that caring for an individual with dementia is extremely difficult. N.T.[,] 05/13/21[,] at 181-[]86. The [trial] court also states that it does

_____

[6] Judge Johnson also served as the PCRA judge.

not think that [Appellant] is a bad person but handled the care in regard to his mother incorrectly. *Id.* The [trial] court did not make its finding on its own personal experience[,] but listened to the facts and weighed the credibility of the witnesses and found [Appellant] guilty. *Id.* Thus, [Appellant's] trial counsel did not err in not moving for a motion of recusal and was not ineffective….

PCRA Court Opinion, 5/2/25, at 12-13. The record supports the PCRA court's findings and conclusion.

Our review discloses that at trial, Judge Johnson made the following statements regarding the court's consideration of its own experiences with a dementia patient, *i.e.*, Judge Johnson's mother:

The [c]ourt is familiar with dementia and Alzheimer['s] patients because the [c]ourt had to solely take care of his mother for eight years. So[,] the [c]ourt does find credible periods of time when the patient will lose it. Will come at you with knives, cups and water, and throw things at you.

But what's interesting about this case—and I can tell you that I witnessed that with my mother—and I'm an only child. I took care of her. I took care of her with aid[e]s, but I took care of her. For the evenings.

But the one thing that I found is that during these periods of sundown, … [the] dementia patient is violent, is uncontrollable. It's limited. Their memory is limited. They don't remember that they threw water at you. They don't remember that they attacked you with a knife or icepick. They don't remember. It's part of the illness.

But what is clear and what is damning in this situation, is that [presently, Allen] remembers her son slapping her in the face.

Now, today, that's all she remembers. … [The i]ncident took place in 2019. [] [N]ormal aging, despite the history of dementia, has this effect. But this one incident of slapping in the face is a constant—[Allen] testified to it with such credibility, despite my fear of her mental ability to be swayed, but she wasn't swayed [during] cross[-examination]. That was my fear. But

- 13 -

[Allen] wasn't swayed.  She was consistent.  Consistent that she remembers her son, and she knows her son slapped her in the face.

**So the [c]ourt looks at the records, looks at the exhibits.  And the [c]ourt sees the bruise.  The [c]ourt sees the bruise under the eye.  That substantiates the fact that [Allen] was hit in the face.**

Then the [c]ourt is challenged with looking at all the medical information and all of the medical records, and the [c]ourt notes that Mainline Health Lankenau Hospital indicates, Patient states she called the police after she was choked.

Now, I did not expect to find a picture of bruises around the neck.  … [An i]nterview was done at Lankenau Hospital where [Allen] indicates she was choked, and there are bruises.

**While [] Allen cannot remember being choked today, evidence supports the fact that [Allen] was choked then**….

Now I don't believe [Appellant] is a bad person.  I do believe that is difficult.  It is extremely difficult—I know—to deal with dementia or Alzheimer['s] patients. … It's hard.

I know for a fact that dementia patients … lay on the floor—they don't know why.  They just get up one day and say they can't walk.  … You don't leave them there.  … Emergency [personnel] will come to the home and pick the patient up for you.  They don't charge you.  They're not mad at you.  Paramedics will come.  I know.

The multiple times my mother was on the floor, they came….

It's outrageous for me to hear that someone laid on the floor for hours.  I don't know how many hours.  I'm not sure how many days.  Because one testimony [*sic*] said it took place on a Tuesday.  That travels over to Wednesday.  How many hours was that?

… That does disturb me.  It shows a lack of disregard [*sic*]… for the safety of your mother.  Lack of disregard [*sic*] for her welfare.  Lack of disregard [*sic*] for the respect you should have for a mother.  Whether [she has] dementia, Alzheimer['s] or whatever.

And that goes back to the fact …, why didn't [Appellant] let the home health aid[e] in? [Ms. Conway] got there early. Heard people in the house. Knocked on the door. Made phone calls, but she was kept out for 20 minutes on the steps. [Ms. Conway] was credible. She came in. She asked what was going on. She saw the disarray of the house. [Appellant] and [Ms. Allen] get [*sic*] into it.

The [c]ourt finds all those [witnesses] credible …. I found [Appellant] incredible in your testimony about what you claim the incident was that surrounded your mother. I do believe that your mom probably did threaten you. I do believe your mom probably chased you around the house. I do believe you handled it all wrong. All wrong.

I do believe the fact … you've threatened your mother in the past. I do believe the fact that the caretaker said that you guys got into it. I believe there's a history of domestic violence. Of … unkindness, uncaring.

N.T., 5/13/21, at 181-86. In rendering its verdict, the trial court acknowledged that

the [c]ourt was not sure with regard to … aggravated assault, because the [c]ourt thought, … maybe you're just guilty of simple assault with losing your temper and, unfortunately, losing your temper or hitting your mother—or slapping your mother.

But when the [c]ourt saw these finger marks around the neck, … and there's no explanation for them—and Mainline Health Lankenau Hospital indicates you choked your mother, that forced the [c]ourt to rethink, and the [c]ourt now finds you guilty of aggravated assault [as a first-degree felony].

*Id.* at 187.

Although the trial court often spoke of its own experience with a dementia patient, the record is clear the court referred to and considered only the testimony and record evidence in rendering its credibility determinations

and verdict. For this reason, we conclude Appellant's claim that Judge Johnson relied on his personal experience, rather than the evidence, in rendering his verdicts lacks arguable merit. Consequently, Appellant's ineffectiveness claim warrants no relief. ***Thomas***, 323 A.3d at 621; ***Williams***, 141 A.3d at 454.

Appellant additionally argues that trial counsel rendered ineffective assistance by not objecting to the trial court's questioning of witnesses and Appellant. Appellant's Brief at 19. As stated above, Appellant claims his trial counsel's failure to object during the trial court's "biased questioning hindered Appellant's ability to challenge the fairness of the bench trial." ***Id.***

Our review discloses that on direct appeal, Appellant claimed the trial court was biased, based upon its questioning of witnesses. ***See Vann***, (unpublished memorandum at 3-4 (describing the trial court's interruption of Allen's testimony to inquire about Allen's understanding of the questions posed by counsel), 8 (describing the trial court's questioning of Ms. Hall regarding how long she was at the residence with the home health aide), 9-12 (describing the trial court's questioning of Appellant regarding the length of time Allen remained on the floor of the residence)). Although this Court deemed the issue waived, ***see id.*** (unpublished memorandum at 21), we additionally concluded the issue lacks merit:

> Pennsylvania Rule of Evidence 614 provides that, if the interest of justice requires, the trial court "may examine a witness regardless of who calls the witness." ***See*** Pa.R.E. 614(b). Further, the Pennsylvania Supreme Court has stated that although "a trial judge should normally leave questioning of witnesses to counsel, justice may require that a trial judge ask questions when absurd,

ambiguous, or frivolous testimony is given or testimony is in need of further elucidation." ***Commonwealth v. Carson***, … 913 A.2d 220, 249 (Pa. 2006); ***see also Commonwealth v. Lanza***, … 323 A.2d 178, 179 (Pa. Super. 1974) ("A trial judge has the inherent right, and, at times, the duty to question witnesses to clarify existing facts and to elicit new information"). "A major reason for the restrictions on a trial judge's questioning is the concern that his conduct may lead the jury to conclude that the court has made up its mind on the question of the defendant's guilt, and that the jury should follow the judge's opinion." ***Commonwealth. Seabrook***, … 379 A.2d 564, 567 (Pa. 1977). "That consideration, of course, is not present in a bench trial." ***Id.*** at 568. Regardless, even in a bench trial, "questioning from the bench should not show bias or feeling nor be unduly protracted[.]" ***Id.*** (citation omitted). This is because "the parties are entitled to a fair fact-finder who, while not allowing himself to be put in a straitjacket by the adversary system, does not attempt to banish the restraints of that system from the courtroom." ***Id.***

Here, during the bench trial, the trial judge asked questions of each witness except Allen. The questions sought clarification of the trial testimony, and at times elicited testimony favorable to the defense. In questioning [Appellant], the court sought clarification of the timeline of the fight and how long Allen had remained on the floor, and, although the questioning spanned a couple pages of testimony, [Appellant's] answers needed further clarification, as exemplified by his admission that he had been incorrect and [that Allen] had fallen on Wednesday morning, not Tuesday morning. Further, that the court expressed concern for Allen, who all parties admit had memory problems, did not exhibit a bias that would require a new trial. This issue lacks merit.

***Id.*** (unpublished memorandum at 21-22).

Thus, Appellant's underlying claim of bias lacks arguable merit. Consequently, Appellant's ineffectiveness claim, based on trial counsel's failure to object to the trial court's purportedly biased inquiries, fails. ***Thomas***, 323 A.3d at 621; ***Williams***, 141 A.3d at 454. Accordingly, we affirm the order of the PCRA court.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/26/2026