J-S11024-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL VANN | : | |
| | : | |
| Appellant | : | No. 2502 EDA 2021 |

Appeal from the Judgment of Sentence Entered November 9, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0002081-2020,
CP-51-CR-0003166-2020

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL VANN | : | |
| | : | |
| Appellant | : | No. 2503 EDA 2021 |

Appeal from the Judgment of Sentence Entered November 9, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0003166-2020

BEFORE:  OLSON, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY McLAUGHLIN, J.:               **FILED AUGUST 2, 2023**

Michael Vann appeals from the judgment of sentence entered following

his bench trial conviction for aggravated assault, simple assault, recklessly

endangering another person ("REAP"), two counts of terroristic threats with

intent to terrorize another, and three counts of harassment.[1] He argues the trial judge should have recused and exhibited bias in his comments and in his questioning of Vann, and the errors resulted in cumulative prejudice. We conclude Vann waived his claim that the trial judge should have recused and find his remaining claims lack merit. We affirm the judgment of sentence.

In August 2019, Vann was arrested for the assault and REAP charges for injuries sustained by his mother, who has dementia.[2] In March 2020, he was charged at a separate docket for making threatening phone calls to his niece.[3] The trial court consolidated the cases.

In May 2021, the Honorable Vincent L. Johnson ("trial judge") conducted a bench trial. Prior to trial, the court conducted a colloquy and found Vann knowingly and voluntarily waived his right to a jury trial. N.T., May 13, 2021, at 5-8. The trial judge did not inform Vann during the colloquy that the trial judge's mother suffered from dementia and that the trial judge had been a primary caregiver for his mother.

The Commonwealth first presented the testimony of Vann's mother, Theola Vann Allen. Allen testified that on the day that she was taken from her home by EMS, she had been injured when Vann slapped her face. *Id.* at 10.

---

[1] 18 Pa.C.S.A. §§ 2702(a), 2701(a), 2705, 2706(a)(1), and 2709(a)(4), respectively.

[2] The assault and REAP charges were docketed at CP-51-CR-0002081-2020 ("assault docket").

[3] The harassment and terroristic threat charges were docket at CP-51-CR-0003166-2020 ("harassment docket").

She further testified that Vann pushed her. *Id.* at 11. She did not recall how many times he slapped her. *Id.* at 10. Allen testified she has used a wheelchair since the incident. *Id.* at 12. During cross examination the following exchange occurred, where the trial court expressed concern for Allen:

> Q: And you went – when you came after and you attacked your son [Vann] on that day? Do you remember that?
>
> A: Did I?
>
> Q: Do you remember charging at him?
>
> A: No.
>
> THE COURT: Can I talk to you in the back?
>
> (Whereupon there was a brief discussion on the record in camera.)
>
> THE COURT: Here's my problem. Nothing is wrong, except it hasn't been established that she has a problem with her memory. You're leading. He's letting you. It's fine with me.
>
> [Defense Counsel] REILLY: It's cross-examination.
>
> THE COURT: It's cross-examination, but I just want to make sure that she's okay. You know what I'm saying? We've established that she's mentally fine. You gave that information to me.
>
> [Assistant District Attorney] BLUMENTHAL: She's well enough to testify.
>
> THE COURT: I just want to make sure, because I don't want her in a situation where she'll say, I mean – you're permitted to lead on cross. I just want to make sure she's mentally fine. And I just want to establish that. We did that before. I just want to make sure. I don't want her to say yes to everything.
>
> MR. BLUMENTHAL: Your Honor, I think, as you can see, at least as my impression of the witness, and it's yours that, ultimately, matters, but she wouldn't let me lead her and she -- I mean, in the sense that I was --

THE COURT: You were fine.

MR. BLUMENTHAL: And she's not letting him lead her.

THE COURT: Well, I mean, he's asking a leading question, and that's his right to.

MR. BLUMENTHAL: Yes.

THE COURT: But the last question was, for example, she did stop you when you said, as a child, you know, she would slap him but not as an adult. And your last question was what bothered me. Your last question was -- and I didn't get an answer from her, but you asked whether or not she hit him. It was a pause with her, and it just concerned me. But I see where you're going from. It just bothered me because of her age, but we'll see where it goes.

MR. BLUMENTHAL: Your Honor, I'm sensitive to this, too, but I'm also sensitive to making sure you have a full picture and letting him conduct his --

THE COURT: It's fine. I mean, as long as you're fine and her mental stability is okay. I'll see where this goes, and we'll see what happens at the end.

MR. BLUMENTHAL: She always – I shouldn't characterize her, but I was comfortable with her, and I mean, we got to let her give her answers for better or worse from here.

THE COURT: She's doing okay. I just wanted to make sure what we're doing.

*Id.* at 19-21. Vann did not object.

Allen's home health aide, Marsha Conway, testified next. She said that on the date of the incident, when she knocked on the door and rang the doorbell, no one opened the door, even though she heard noise in the house. Approximately 20 minutes later, Vann let her in the house. Vann told Conway that he and his mom "had it out that day." *Id.* at 33. She testified that the house was in disarray, with a knife on the floor, plants and pots all over the

- 4 -

floor, and bleach in the middle of the floor. *Id.* at 33, 35. She further testified that Allen was laying in the upstairs hallway with a blanket and pillow. *Id.* at 33-34. Conway testified that Allen told her she does that sometimes. *Id.* at 34. She further stated that Allen told her that she and Vann "had it out, or whatever," and that Conway asked Allen if she wanted Conway to call the cops, and Allen told her the police were there at 4:00 a.m. *Id.* Conway testified that about an hour after she arrived, she called Allen's granddaughter, who also said Allen sometimes lays on the floor. *Id.* at 34-35.

Conway testified that she asked Vann to help her get Allen up, but he said no. *Id.* at 37. She testified that Vann "was fussing, talking about she's crazy and we're going to 302 her. And that's what the cop said at 4 o'clock in the morning." *Id.* at 38. She further testified that Allen acted like she was afraid of Vann, stating that "when he would go out, she would talk about him. But when he [sic] come in, she would switch the conversation a bit . . . So she didn't want to say too much around him." *Id.* at 39.

Conway testified that about 15 minutes before she was scheduled to leave, Vann's girlfriend came and helped her get Allen dressed and in bed. *Id.* at 39-40. She testified that she did not see any injuries and did not call the police because Allen and Vann had said the police had already been there. *Id.* at 45, 50.

The trial court asked Conway if either Vann or Allen explained what "got into it" meant, and she responded that they did not. *Id.* at 40-41.

Allen's granddaughter, Tawanna Vann ("Tawanna"), testified that on the day of the incident she received calls from the home health care aid. During one of the calls, she spoke to Allen, who told her that "[Vann] had beat her up." *Id.* at 54-55. Tawanna asked Allen if she wanted her to call the police, but Allen said the police had already been to the house. *Id.* at 55. Tawanna said a couple of hours later, she received a call stating the ambulance was going to take Allen to the hospital. *Id.* Tawanna stated that when the hospital called, she told them that Allen had told her that Vann beat her up. *Id.* at 56. She stated that Vann then left messages on her phone calling her a "bitch" and saying "Imma kill you" and that he was going to send people to touch her. *Id.* at 56 and 59. The Commonwealth played the voicemails for the factfinder.

Tawanna testified that she had observed Allen lying on the floor prior to this occasion. *Id.* at 61-63. The court asked Tawanna if she had ever observed Vann strike Allen, and Tawanna testified that she had not. *Id.* at 71. When the court asked if Allen had ever told her that Vann had hit her, Tawanna testified that, "She would say like [Vann] – I told [Vann] to get that woman out my house. He hit me upside my head. That kind of stuff." *Id.* She further testified that Allen had "never been in a place of incapacity," and "[Vann] was her son and they got into it, and . . . this has been going on for years." *Id.* at 75-76. She further agreed with the assistant district attorney that one reason she did not call the police was because she had had the discussion with Allen on prior occasions and Allen was always reluctant to call the police. *Id.* at 73.

The Commonwealth admitted the medical records into evidence, including records showing that there was bruising on Allen's fingers and eye, markings around her neck, and bruising on her leg. *Id.* at 80. Further, the records stated that Allen "states that [Vann] grabbed her by the neck, choked her, punched her in the right eye and shoved her to the ground, breaking her hip in the process." *Id.* at 83. The parties stipulated that the police dispatch report incident history details from July 1 through July 30 at Ms. Allen's address "show[ed] no police response before July 10th, at approximately . . . a military time of 18:18:25, which . . . is 6:00 p.m.," with "a report of [an individual] not feeling well." *Id.* at 78. They stipulated that "there [wa]s no incident report on the Philadelphia Police records before 6:00 p.m. on July 10th." *Id.* The Commonwealth entered the EMS Dispatch Report into the record. *Id.*

Vann's girlfriend at the time of the incident, Carla Hall, testified for the defense. She stated that on the day before Allen went to the hospital, Hall went to Vann's house after work and took Allen for ice cream. *Id.* at 90. She stated they drove around and Allen was happy, and then an hour or two later, Hall took Allen home. *Id.* Hall testified that after they returned Allen "did a 360 change." *Id.* Allen was saying that she did not want Vann in the house, and closed and locked the door. *Id.* at 92. Hall testified that she and Vann were on the enclosed porch, and Allen came out with a hammer, which Hall got from her. *Id.* at 92. Allen returned with an ice pick, which Hall also took from her. *Id.* at 93. She testified that the police came, and Allen said she

- 7 -

wanted Vann out, but the police said they could not do that. *Id.* at 94-95. Hall testified that Vann and Allen went upstairs, and Hall thought Allen got a knife and tried to jab Vann, which caused Allen to fall and hit her face on a table. *Id.* at 95. Hall eventually left around 3:00 or 4:00 a.m. *Id.* at 116-17. She returned the next day when Conway was at the house. *Id.* at 97. Hall testified that she got mad when she arrived because Allen was on the floor. *Id.* Hall testified she tried to get Allen up, but could not, and that she went to the hospital with Allen. *Id.* Hall testified that she previously had seen Allen fight Vann, but he did not fight back. *Id.* at 106.

The trial court asked Hall how long she was there with the home health care aide, and Hall responded she and the aide were there about an hour and that the aide was there when the ambulance arrived. The court also asked what the house looked like when the ambulance arrived, and Hall said the upstairs was a little messy, but the downstairs was nice. *Id.* at 118-19.

Vann also testified. He stated that he was taking care of Allen at the time of the incident. *Id.* at 123-24. He testified that on the day before Allen was taken to the hospital, Hall took Allen for a drive. When they got back, Allen ate dinner, and then she and Vann got into an argument. *Id.* at 127-130. Vann testified that Allen attacked him with a steak knife, and "caught [him] on [his] right [wrist]." *Id.* at 130. Vann said Allen tried to throw a concoction of bleach and ammonia in his face, and that she just kept coming at him, including with a hammer and an icepick. *Id.* 130-31. He testified that the police had told him that he would have to go to the crisis center at Mercy

Hospital to make a report to have Allen committed. *Id.* at 131-32. He stated that when Allen heard that, she started swinging and when he ducked, she fell and hit her face, and he left her there. *Id.* at 132. He testified that he and Hall took turns watching her that night. *Id.* He testified that he eventually offered to help Allen up, but she said no. *Id.* He testified it was not uncommon for Allen to want to stay on the floor. *Id.*

During Vann's testimony, the court conducted the following questioning:

> THE COURT: Hold on. Just remember where you were. What time and what date did your mother fall?
>
> THE DEFENDANT: My mother fell, I think, Tuesday evening, sir.
>
> THE COURT: So she fell Tuesday. This is now -- she finally was moved on Wednesday?
>
> THE DEFENDANT: Yes.
>
> THE COURT: So you're telling me that your mother was -- she fell sometime -- what time Tuesday?
>
> THE DEFENDANT: This went on until about 1:00 or 2:00 in the morning.
>
> THE COURT: So now, what time did your mother fall? Tuesday at what time? A.m.? P.m.?
>
> THE DEFENDANT: Like in the a.m., sir.
>
> THE COURT: So on Tuesday, wouldn't that be July 9th?
>
> THE DEFENDANT: That would be like...
>
> THE COURT: I don't need a date, but she fell on Tuesday in the a.m.
>
> THE DEFENDANT: Correct. I was off that Wednesday.
>
> THE COURT: So Tuesday in the a.m., and that's when the altercation took place?

THE DEFENDANT: Excuse me?

THE COURT: And that's when the altercation took place? Sometime in the a.m. she's on the ground?

THE DEFENDANT: The altercation started Tuesday evening into --

THE COURT: Well, I'm asking you. When she fell and stayed on the floor, that was Tuesday?

THE DEFENDANT: Yes.

THE COURT: And you tell me Tuesday a.m.? You know a.m. and p.m.?

THE WITNESS: Yes. A.m. is in the morning and p.m. is in the evening.

This is like – I'm sorry -- Wednesday in the a.m. I'm sorry. Wednesday in the a.m. I'm sorry.

THE COURT: You sure?

THE DEFENDANT: Yes, I'm positive.

THE COURT: Now, Wednesday morning, a.m., she's on the floor?

THE DEFENDANT: Yes. We called the police Wednesday evening.

THE COURT: You called them Wednesday evening.

Now, they came before, right?

THE DEFENDANT: Yes, they did.

THE COURT: What time did they come before?

THE DEFENDANT: Sir, I really don't know.

THE COURT: Was that Tuesday or was it Wednesday?

THE DEFENDANT: That was like...

THE COURT: It was between -- 4'clock before, right?

THE DEFENDANT: I can't recall.

THE COURT: You don't remember?

THE DEFENDANT: No, sir.

THE COURT: So it's your recollection today that your mom fell Wednesday morning?

THE DEFENDANT: Yes.

THE COURT: And she stayed on the ground Wednesday morning until Wednesday night?

THE WITNESS: Until Wednesday, like, afternoon.

THE COURT: Until Wednesday afternoon?

THE DEFENDANT: Yes.

THE COURT: Okay. Well, what I'm trying to figure out is what happened at 8:30 a.m.? You know, you said your mom was in the robe -- 8:30 p.m. I'm sorry.

THE DEFENDANT: Excuse me?

THE COURT: Your mom was in the robe?

THE DEFENDANT: That was Tuesday.

THE COURT: You're [sic] mom is in the robe Tuesday?

THE DEFENDANT: Yes, that was Tuesday afternoon. Carla -- yes.

THE COURT: Tuesday – that's what I'm saying. So it started Tuesday?

THE DEFENDANT: Yes.

THE COURT: It started Tuesday. At least Tuesday 8:30 p.m., that's what you just told me?

THE DEFENDANT: Yes. Probably so, yes.

THE COURT: And she was in a robe Tuesday, 8:30 p.m.?

THE DEFENDANT: Yes.

THE COURT: Because that's what I wrote down.

THE DEFENDANT: Yeah.

THE COURT: And you told me the ride took place Tuesday afternoon?

THE DEFENDANT: Tuesday afternoon.

THE COURT: So Carla came on Tuesday.

THE DEFENDANT: Yes.

THE COURT: The day before Wednesday. This is what you told me. That's when she went for the ride. Is that what you're saying?

THE DEFENDANT: Yes. I think so, yes, sir.

THE COURT: All right. And the fight takes place, not Tuesday, but she has argument with you on Tuesday?

THE DEFENDANT: Yeah. She tried to --

THE COURT: She tried to hurt you on Tuesday?

THE DEFENDANT: Yeah. Sir, I believe...

MR. REILLY: Judge, can I just --

THE COURT: No, I'm not done. You can clarify anything I'm missing. I just want to finish this one question.

MR. REILLY: It is his direct examination for the record.

THE COURT: Yes. Just one question -- all right. I'm going to stop.

*Id.* at 135-140. Vann did not object to the questioning.

After the trial, the court found Tawanna, Conway, and Allen to be credible, and accepted their testimony in full. It found Hall not credible, and found Vann to be credible in part and not credible in part. The trial judge then made comments regarding his experience as a primary caregiver for his mother, who had dementia, and made factual findings:

> Domestic violence is difficult to deal with when you have a patient who has dementia.
>
> The Court is familiar with dementia and Alzheimer patients because the Court had to solely take care of his mother for eight years. So the Court does find credible periods of time

- 12 -

when the patient will lose it. Will come at you with knives, cups and water, and throw things at you.

But what's interesting about this case -- and I can tell you that I witnessed that with my mother -- and I'm an only child. I took care of her. I took care of her with aid[e]s, but I took care of her for the evenings.

But one thing that I found is that during these periods of sundown, or whatever incidents take place, dementia patient is violent, is uncontrollable. It's limited. Their memory is limited. They don't remember that they threw water at you. They don't remember that they attacked you with a knife or icepick. They don't remember. It's part of the illness.

But what is clear and what is damning in this situation, is that this is 2021. 2021. Ms. Vann Allen remembers her son slapping her in the face.

Now, today, that's all she remembers. Today, that's all she remembers. Incident took place in 2019. A normal aging, despite the past history of dementia, has this effect. But this one incident of slapping in the face is a constant -- she testified to it with such credibility, with such sincerity, despite my fear of her not being able -- because of her mental ability to be swayed, but she wasn't swayed at cross. That was my fear. But she wasn't swayed. She was consistent. Consistent that she remembers her son, and she knows her son slapped her in the face.

So the Court looks at the records, looks at the exhibits. And the Court sees the bruise. The Court sees the bruise under the eye. That substantiates the fact that the mother was hit in the face.

Then the Court is challenged with looking at all the medical information and all of the medical records, and the Court notes that Mainline Health Lankenau Hospital indicates, Patient states she called the police after she was choked.

Now, I did not expect to find a picture of bruises around the neck. Bruises around neck. This was done -- interview was done at Lankenau Hospital where she indicates she was choked, and there are bruises.

While Ms. Vann Allen cannot remember being choked today, evidence supports the fact that [in] 2019 she was choked then. She was choked then.

Now, I don't believe that [Vann] is a bad person. I do believe that it is difficult. It is extremely difficult -- I know -- to deal with dementia or Alzheimer patients. No matter how m[uch] you love them. It's hard.

I know for a fact that dementia patients – it's not hereditary -- they lay on the floor -- they don't know why. They just get up one day and say they can't walk. Can't walk. You don't leave them there. 911. Emergency will come to the home and pick the patient up for you. They don't charge you. They're not mad at you. Paramedics will come. I know.

The multiple times my mother was on the floor, they came. Hey, Judge, back again for the 99th time. How you doing? I'm fine. Let's put your mom in bed.

It's outrageous for me to hear that someone laid on the floor for hours. I don't know how many hours. I'm not sure how many days. Because one testimony said it took place on a Tuesday. That travels over to Wednesday. How many hours was that?

And counsel's right. That does disturb me. It shows lack of disregard. Lack of disregard for the safety of your mother. Lack of disregard for her welfare. Lack of disregard for the respect you should have for a mother. Whether she's dementia, Alzheimer or whatever.

And that goes back to the fact that, hmmm, why didn't he let the home health aid[e] in? She got there early. Heard people in the house. Knocked on the door. Made phone calls, but she was kept out for 20 minutes on the steps. She was credible. She came in. She asked what was going on. She saw the disarray of the house. Son and mother get into it.

Just because you're the son, doesn't mean – you're the only caretaker available. Your mom has a new caretaker now. If you couldn't do the job, you could have given her to someone else to take care of it. It[] wasn't your responsibility, if you could not manage the stress that goes with it. And there is stress -- and I understand -- that goes with it.

> The Court finds all those credible I indicated credible. I find you incredible in your testimony about what you claim the incident was that surrounded your mother. I do believe that your mom probably did threatened [sic] you. I do believe your mom probably chased you around the house. I do believe you handled it all wrong. All wrong.
>
> I do believe the fact that your niece has indicated that you've threatened your mother in the past. I do believe the fact that the caretaker said that you guys got into it. I believe there's a history of domestic violence. Or domestic – let's put it this way – unkindness, uncaring.

*Id.* at 181-86. Vann did not argue that the judge's comments were improper or seek recusal or a new trial before a different judge.

At the harassment docket, the court found Vann guilty of two counts of terroristic threats and three counts of harassment and found him not guilty of intimidating a witness and retaliation against a witness. At the assault docket, the court found Vann guilty of REAP, simple assault, and aggravated assault. In reaching the aggravated assault verdict, the court stated:

> [T]he Court was not sure with regard to Count 1, aggravated assault, because the Court thought maybe, maybe, maybe you're just guilty of simple assault with losing your temper and, unfortunately, losing your temper or hitting your mother -- or slapping your mother. But when Court saw these finger marks around the neck, when the Court saw these around the neck -- and there's no explanation for them – and the Mainline Health Lankenau Hospital indicates you choked your mother, that forced the Court to rethink, and the Court now finds you guilty of aggravated assault, F1.

*Id.* at 187.

At sentencing, Vann's counsel included in his argument to the court the following, invoking the trial judge's experience with his mother:

- 15 -

> [D]uring the reading of the verdict, this court shared a little bit about how you had similar experiences with an elderly mother who declined mentally, and I don't mean to be personal[.]. . . And the reason I remind the Court today is, by no means am I saying you saw yourself in the shoes of Mr. Vann or you ever committed the acts that Mr. Vann has been convicted of, but I think you probably recognize it was tough for Mr. Vann.

N.T., Nov. 9, 2021, at 7.

The court sentenced Vann to an aggregate term of eight to 16 years' imprisonment and four years' probation.

Vann filed a timely notice of appeal and raises the following issues:

> 1. Was there not a violation of state law and due process because there was an objective appearance of a lack of impartiality by the judge at this non-jury trial who did not timely disclose that his mother had dementia, like the complainant who alleged that her son [Vann], had assaulted her, and whose statements while rendering the verdict revealed how his extensive experiences with his mother gave him knowledge and feelings about people with dementia that played a role in his decision?
>
> 2. Was there not a violation of state law and due process because the judge's intervention in the questioning of witnesses gave the appearance of a lack of neutral impartiality?
>
> 3. Did not the judge's conduct at this trial cumulatively present an appearance of a lack of impartiality in violation of state law and due process?

Vann's Br. at 2 (capitalization regularized).

Vann argues the trial court violated his due process right to an impartial factfinder because the trial judge did not reveal that his mother had dementia and that he had been a primary caregiver for her. Vann points out the main charge was aggravated assault of Vann's mother, who had dementia. He

- 16 -

argues the trial judge's "lengthy statement about his experiences with his mother, and what he learned about dementia as a result, left an objectively undeniable appearance that these feelings played a role in his resolution of this case, and that it was not decided solely on the evidence." Vann's Br. at 12. Vann maintains that the trial judge failed to disclose that he had been a caretaker for his mother until he was rendering the verdict, and this failure "denied [Vann] the opportunity to seek recusal or to decide to have a jury trial." *Id.* at 12-13. Vann argues the trial judge knew the victim had dementia prior to trial, as a docket entry states a motion to present expert testimony was granted "limited to overview of dementia and any tests of complainant." *Id.* at 15 n.2.

Vann points out that in a jury trial, it is reversible error if a party is denied the right to ask potential jurors questions that may expose biases. He states that a party cannot *voir dire* a judge, and therefore "it is imperative that the judge fulfill his duty to disclose any possibly relevant information about personal circumstances and feelings about those experiences to counsel." *Id.* at 16-17. He points out that Code of Judicial Conduct Rule 2.11 requires judges to disclose information the judge believes the parties or lawyers might reasonably consider relevant to a motion to disqualify, even if the judge does not believe it to be a basis for disqualification.

Vann further argues that with *voir dire*, a court must grant a challenge for cause if the record objectively leaves doubt as to the juror's ability to eliminate the "influences of his scruples and render a verdict according to the

evidence." *Id.* at 19 (citation omitted). He notes that the Code of Judicial Conduct requires that a judge "shall not permit family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment." *Id.* at 20 (quoting Code of Judicial Conduct Rule 2.4(B)). He also points out the Code requires a judge to recuse if his or her "impartiality might reasonably be questioned." *Id.* (quoting Code of Judicial Conduct Rule 2.11). He notes the standard of whether impartiality might reasonably be questioned is an objective one, and therefore the trial judge's belief that his experience did not impact the decision is irrelevant. Vann maintains the verdict was not based solely on the evidence. He argues the lack of an impartial judge was a structural error, requiring remand.

In his reply brief, Vann argues he did not waive the claim of judicial bias. He argues the trial judge did not disclose that he had been a caregiver for his mother, who had dementia, until rendering the verdict. Vann argues this is not a situation where he had information necessary to seek recusal, but waited as a matter of trial strategy. Further, he argues that although a judge is presumed to be honest, fair and impartial, the presumption "does not overcome the need for a jurist to disclose critical information that may objectively disclose a potential for bias." Vann's Reply Br. at 6-7.

"[A] party must seek recusal of a jurist at the earliest possible moment, i.e., when the party knows of the facts that form the basis for a motion to recuse." *Lomas v. Kravitz*, 170 A.3d 380, 390 (Pa. 2017). "If the party fails

to present a motion to recuse at that time, then the party's recusal issue is time-barred and waived." *Id.*

In *Commonwealth v. Blount*, 207 A.3d 925 (Pa.Super. 2019), the defendant argued the court should have recused because the judge did not accept the sentence agreed upon by the parties. We concluded that the defendant had not preserved the claim because she did not object or make a motion to recuse at the earliest possible moment. There, at the commencement of a re-sentencing hearing, the trial judge "expressly indicated she had discretion to accept or reject the negotiated sentence, and she would not make a decision until after she considered the appropriate sentencing factors." *Id.* at 932. In finding the defendant had not preserved the claim, the Court pointed out that the defendant did not object or make a motion for recusal at that time. "Rather, [the defendant] waited until after the close of all testimony, evidence, and arguments before seeking [the trial judge's] recusal." *Id.*

Similarly, here, Vann did not object or seek a recusal at the earliest possible moment, that is, when the trial judge discussed his experience in caring for his mother, or even after the verdict, which was immediately after the comments. Rather, Vann attended and participated in sentencing, with his counsel specifically mentioning the trial judge's experience when discussing sentencing considerations. Vann never filed a motion for recusal in the trial

court. Instead, he raised the recusal issue for the first time on appeal. We therefore conclude he waived this issue.[4]

Vann next argues that "there was . . . the appearance of bias during questioning of witnesses." Vann's Br. at 13. He argues the court interrupted defense counsel to express his concern for Allen, and claims the court feared Allen "would be swayed by cross-examination." *Id.* He noted that the prosecutor acknowledged Allen was doing fine and not simply being led by defense counsel. Vann argues the trial judge's intervention to tell counsel his concerns that the witness would say yes to his leading questions was improper

---

[4] In his reply brief, Vann relies on **United States v. Kelly**, 888 F.2d 732 (11th Cir. 1989), a decision from the Unites States Court of Appeals for the Eleventh Circuit. There, the trial judge's wife was close friends with a wife of a defense witness. The trial judge had known the witness would be a witness in a case before him and learned on the third day of trial that he would be a witness in the defendant's case. The judge did not inform the parties of the relationship until the fifth day of trial. He at first said he would recuse, but then decided not to recuse. The judge "made it clear" that he would have recused if he was confident retrial would not be barred by double jeopardy principles. He informed the parties they could either consent to a mistrial or to his continuing with the case. The prosecution stated it would consent to a mistrial, but the defendant declined, reasoning he had spent a "great deal of money" and "gone through a great deal." *Id.* at 738. The Court noted that the trial judge indicated on multiple occasions that he held the defendant responsible for his difficult position. Applying federal law, the Court of Appeals found the claim was not barred as untimely, as it was not a case where the recusal issue had been abused as an element of trial strategy. The Court noted that although the defendant knew of an indirect social relationship between the judge and witness, he did not know the extent until the next-to-last day of trial and that it was not until the court was rendering its verdict that the defendant became aware that the judge was irritated with the defendant. Here, we must apply Pennsylvania law, and note Vann could have filed a motion for recusal following the verdict and prior to sentencing, but rather he waited until after sentencing to raise his claim.

and gave the appearance of bias. Vann further claims the court treated him differently when he took the stand, claiming the judge "conduct[ed] a vigorous challenging cross-examination of [Vann], and only stopped when counsel interjected and pointed out that he was still doing direct examination." *Id.* at 25. Vann claims the court does not have a right to cross-examine a defendant, asserting that a judge can ask questions only if clarification is needed. Vann argues the judge assumed the role of advocate, with questions that were not merely clarification, and "displayed a lack of patience, neutrality and impartiality required of a jurist at any trial." *Id.* at 27.

Vann did not object below to the judge's expression of concern about Ms. Allen or his questioning of Vann, or otherwise claim below that "the judge's intervention in the questioning of witnesses gave the appearance of a lack of neutral impartiality." He has therefore waived this issue as well. *See* Pa.R.A.P. 302(a).

The issue lacks merit in any event. Pennsylvania Rule of Evidence 614 provides that, if the interest of justice requires, the trial court "may examine a witness regardless of who calls the witness." *See* Pa.R.E. 614(b). Further, the Pennsylvania Supreme Court has stated that although "a trial judge should normally leave questioning of witnesses to counsel, justice may require that a trial judge ask questions when absurd, ambiguous, or frivolous testimony is given or testimony is in need of further elucidation." *Commonwealth v. Carson*, 913 A.2d 220, 249 (Pa. 2006); *see also Commonwealth v. Lanza*, 323 A.2d 178, 179 (Pa.Super. 1974) ("A trial judge has the inherent right,

- 21 -

and, at times, the duty to question witnesses to clarify existing facts and to elicit new information"). "A major reason for the restrictions on a trial judge's questioning is the concern that his conduct may lead the jury to conclude that the court has made up its mind on the question of the defendant's guilt, and that the jury should follow the judge's opinion." ***Commonwealth. Seabrook***, 379 A.2d 564, 567 (Pa. 1977). "That consideration, of course, is not present in a bench trial." ***Id.*** at 568. Regardless, even in a bench trial, "questioning from the bench should not show bias or feeling nor be unduly protracted[.]" ***Id.*** (citation omitted). This is because "the parties are entitled to a fair fact-finder who, while not allowing himself to be put in a straightjacket by the adversary system, does not attempt to banish the restraints of that system from the courtroom." ***Id.***

Here, during the bench trial, the trial judge asked questions of each witness except Allen. The questions sought clarification of the trial testimony, and at times elicited testimony favorable to the defense. In questioning Vann, the court sought clarification of the timeline of the fight and how long Allen had remained on the floor, and, although the questioning spanned a couple pages of testimony, the defendant's answers needed further clarification, as exemplified by his admission that he had been incorrect and she had fallen on Wednesday morning, not Tuesday morning. Further, that the court expressed concern for Allen, who all parties admit had memory problems, did not exhibit a bias that would require a new trial. This issue lacks merit.

In his final argument, Vann argues a new trial is required due to the "cumulative effect of the judge's missteps suggesting an appearance of a lack of requisite impartiality." Vann's Br. at 28.

A court should engage in a cumulative prejudice analysis only where the individual claims failed due to a lack of prejudice. ***Commonwealth v. Hutchinson***, 25 A.3d 277, 319 (Pa. 2011). Here, as Vann's first two claims did not fail due to a lack of prejudice, we need not engage in a cumulative prejudice analysis.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/02/2023